[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff wife commenced this action for a dissolution of the parties' marriage on the ground of irretrievable breakdown by complaint returnable to this court on August 25, 1992. She also seeks alimony, a conveyance of the defendant's interest in jointly owned real and personal property and other relief as on file. The defendant husband filed an answer admitting all of the allegations in the plaintiff's complaint, together with a cross-complaint. In his cross-complaint, he also seeks a dissolution on the ground of irretrievable breakdown, an assignment of the plaintiff's estate pursuant to General Statutes § 46b-81, and other relief as on file. Both parties were represented by counsel CT Page 9940 throughout these proceedings.
At the trial which occupied three court days, both spouses testified, submitted financial affidavits and proposed written orders. Two real estate appraisers and a certified public accountant also testified. Numerous documentary materials were introduced into evidence, including tax returns and appraisal reports. Post trial briefs were submitted after the taking of evidence was concluded. From the evidence the court finds as follows.
The wife, whose maiden name was Elaine Crocetti, married the husband on September 10, 1955 in New London, Connecticut. She has resided continuously in this state for at least one year before July 16, 1992, the date of her complaint. All statutory stays have expired and this court has jurisdiction.
The parties have had three minor children, all of whom are issue of the marriage. They have reached their majority. No other minor children were born to the wife since the date of the parties' marriage. Neither party receives public assistance.
The husband is almost 59 years of age and in good health. He is a high school graduate with some college. He has worked almost all of his career as a sales representative. His first employer, for whom he had worked for about 18 years after his discharge from military service, asked him to take a pay cut. Upset, the husband quit and in 1978 he started his own business with the wife, Restaurant Equipment Supply Corporation (RESCO). Originally, each owned fifty (50%) of the issued and outstanding stock in the corporation. The couple worked together in the business until the spring of 1993. The husband now works as a salesman for Restaurant Design Equipment Corporation (RDEC) which is wholly owned by the parties' son, Rick, which generally took over RESCO's business, selling and designing restaurant and other types of commercial and institutional kitchens, fixtures and equipment. The husband is the president and treasurer of RDEC and earns $700 per week gross, $543 per week net.[1] In addition, he enjoys several perquisites, which include paid car and travel expense, health insurance, golf club dues, meals and entertainment. He also derives about $270 per month in net rental income from the parties' jointly owned duplex and commercial real estate.
The wife is sixty years old and in good physical health, CT Page 9941 although she complains of allergies, a substantial recent weight gain and sees a therapist. She is a high school graduate, with some business school. In the early years of the parties' marriage, she was employed by the federal government in a clerical capacity. She left that employment to have and rear the parties' three children, for whom she was the principal caregiver. She also did the lion's share of the homemaking. She worked as an unsalaried bookkeeper for two years for a restaurant in which the husband had an ownership interest. From 1978 to the spring of 1993, she worked for RESCO as its bookkeeper, handling accounts payable and receivable, payroll, and the like. She is now unemployed and has not actively sought employment, claiming that she is incapable of doing so. There was no medical or expert testimony to support this claim.
The wife asserts that this marriage of over thirty-nine years' duration was troubled from the beginning. She testified that the husband drank regularly and gambled. She had suspicions about `other women' when he kissed her girl friend on the lips; when she found lipstick on a tissue in his car and when she found some underwear not his size. The wife began to distrust him. The husband denies any infidelity. The parties did not communicate. They went through long periods of silence, which continued even at their son's wedding. They separated in June, 1992, when the husband moved out of the jointly owned family home, where the wife now resides with the parties' daughter and a grandchild. The daughter pays no room and board.
The husband agrees that there was never good communication between them, and claims that the wife used a method of not talking to him, whenever she did not get her way. About 1984 she took up competitive artistic roller skating, in which she became intensely involved. This caused her to be out of the home often, sometimes as many as five or six nights a week, and out of town at competitions on numerous occasions. She was accompanied by her male skating partner and her mother. The husband went only once, and when the wife was away would come home to an empty house. At this point the marriage was one in name only.
From this evidence the court finds that the marriage has indeed broken down irretrievably, with no hope of reconciliation. The court cannot find that either spouse was more responsible than the other for the disintegration of their marriage, thus, they must equally shoulder the responsibility for it. CT Page 9942
The wife's lack of trust in the husband carried over to the operations of RESCO. RESCO provided a handsome standard of living not only for this couple, but also provided incomes and motor vehicles[2] for their children, all of whom worked there. The parties transferred six (6%) percent of the issued and outstanding stock of RESCO to each of the three children, so that the parties now each hold forty-one (41%) percent. The wife is a director and president; the husband a director and vice-president. One son, Robert, left RESCO in 1992 to pursue other interests. Their daughter, Debbie, who the wife trained in bookkeeping functions, left RESCO when the wife did. The corporation had gross annual sales of $2,872,328 in 1990; $1,531,065 in 1991 and $800,122 in 1992. It operates on a fiscal year ending September 30. It had net taxable income of $44,674 in 1990 and $6,701 in 1991, and a net taxable loss of $203,936 in 1992.
In those three years the husband drew salaries ranging from a high of $55,000 to a low of $24,645, and received considerable perquisites, such as fully paid car expenses, travel, lodging, meals, golf club dues, etc. During this period the wife drew salaries ranging from a high of $46,000 to a low of $31,600. She also enjoyed her car and other expenses paid. In addition, her mother was on the corporate payroll for a `no-show' job at $100 per week.
In the spring of 1993, with the economy getting worse, customer `downsizing' and stiffening competition, the corporation was suffering hard times. The husband wanted to cut costs and expenses and reduce salaries. Most of RESCO's employees had been laid off. The parties could not work out a sustained compromise or develop a way to keep the corporation afloat, and killed their golden egg laying goose. The wife withdrew over $21,500 of RESCO's funds and expended them for her own use over time. She paid out $20,000 in bonuses; $5,000 each to herself, son Rick and daughter Debbie, and to the husband, who returned his to RESCO. Corporate checks bounced as these transactions were done without the husband's knowledge. The coup de grace was administered by the wife who refused to cooperate with the husband in cosigning individual personal guarantees to enable RESCO to maintain its line of credit. Corporate directors' and shareholders' meetings were not held, although requested by the husband. RESCO has ceased operations, and is now only a shell, and the court finds that it has a present value of $105,000, so that each party's 41% share equals $43,050. CT Page 9943
Kenneth J. Pia, Jr., a certified public accountant, testified on behalf of the wife that RESCO was worth $186,000 as of January 31, 1994, and as of the time of trial. He opined that the business had no intangible value (good will), as it had no significant excess earnings capacity. I discount his opinion of value, which was based on the value of the underlying tangible assets. He also included as a component the sum of $53,753,[3]
a net operating loss carryforward. This component, while an advantage to a potential buyer, or RESCO itself, if it had income, was not reduced to present value, and in any case, would not bring dollar for dollar. Also, the amount Pia assigned to accounts receivable of $50,537 as of January 31, 1994, was no longer current as of the time of trial, nor was it adjusted for collectibility.
The parties wanted for no material things during their marriage and enjoyed a substantial lifestyle. They accumulated several parcels of real estate, cash on hand and in retirement accounts, and valuable tangible personal property. I find that these assets have values as follows:
15 Coult Lane, Old Lyme, CT, the jointly owned marital home; value: $250,000, with no mortgage, having an equity of: $250,000;
4 Mountain View, Wilmington, VT, in wife's name alone, Value: $100,000, with no mortgage, having an equity of: $100,000;
27-29 Meadow View, RI, jointly owned rental duplex, Value: $121,000, with a mortgage of $63,855, having an equity of: $ 57,145;
4 High Street, Old Lyme, CT, the jointly owned commercial real estate now occupied by RDEC under a fixed rent, `triple net' lease, has a value of $300,000, less mortgage of $171,482, having an equity of: $128,518.
With respect to this last parcel, the parties' appraisers differed by about $80,000 in their valuations. I find that both appraisers' valuations were flawed. The wife's appraiser, Adams, used a higher than actually available rental amount, and extrapolated those rentals into the future with an escalation CT Page 9944 factor. This is contrary to the lease presently in existence, which provides for a fixed rent which is lower than that assumed by Adams. Also, other properties in the same subdivision remain undeveloped or unsold. By the same token, Buckley, the husband's appraiser, did not use the proper capitalization factor, in arriving at his opinion, and later corrected his figure and arrived at a valuation $5,000 higher than his original. I also believe that he took an overly jaundiced view of the comparable sales.
The husband reports on his financial affidavit the following: $3,750 in cash in banks; $8,500 in life insurance cash values; $169,983 in IRA accounts, all in various mutual funds; and $18,080 in other miscellaneous stock, bond, money market and mutual funds. Against this he lists $2,800 in liabilities, apart from the mortgages on the jointly owned real estate.
The wife reports on her financial affidavit cash of $13,500 which she has in a safe deposit box under her daughter's name; furs of $4,000; jewelry of $17,000; cash in the bank of $700; IRA accounts of $72,500 and stocks of $1,200. Against these assets, she lists $12,952 in liabilities, $8,804 of which was incurred by her in this litigation for attorney's and accountant's fees; the balance is for unpaid real estate taxes on the marital home and Vermont property.
Significantly, she reports no value for her tangible personal property (other than her furs and jewelry) in the marital home or for the Vermont furniture and furnishings now in storage, which the husband claims are worth in excess of $80,000. At the same time, he reports no value for his tangible personal property, although he testified that he left the marital home with only his clothing and personal effects and then expended $13,000 to furnish his new quarters.
The parties' real estate was largely amassed by the use of savings for down payments and mortgages. The husband has paid off small mortgage balances on the Coult Lane and Vermont properties from his own funds. His IRA accounts are greater in amount than the wife's, although their original contributions were approximately equal, because his investments were more aggressive than hers.
Because of his higher earnings during the marriage and the wife's departure from outside employment during her childbearing CT Page 9945 and rearing years and the success of his investment decisions, I find that his monetary contributions to the acquisition, preservation and appreciation in value of the marital assets were greater than hers. I also find that the wife's non-monetary contributions of child rearing and homemaking were greater than his.
The husband also has superior earnings, vocational skills, employability and earning capacity than the wife, and thus, a greater opportunity to acquire capital assets and income in the future. She does have some vocational skills and earning capacity which the court concludes the wife should make diligent use of.
It is also important to note that the marital dwelling, while showing a `paper profit' of close to $200,000 if sold, would probably be subject to minimal, if any, capital gains taxation in light of the parties' ages and applicable federal law providing for a `one-time' $125,000 exclusion from such taxation. Other significant factors I considered are: the wife can immediately begin to draw taxable income from her retirement funds without penalty; she is entitled to $592 per month in social security benefits at age 62,[4] $740 per month at age 65; the husband will also be entitled to draw on his retirement funds without penalty in the coming year; RESCO has a large tax loss carryforward which may be appealing to a potential buyer (RDEC), and the fact that two of the parties' children, who between them own twelve (12%) percent of RESCO's stock are not on speaking terms with the husband, which may cause difficulty in RESCO's sale or liquidation.
I reject the wife's claim that in the division of the assets the husband's portion should be credited with the decline in value of RESCO, as her actions played a substantial role in its demise. Moreover, there has been no showing that he personally received any financial benefit from RESCO's loss in value.
The court has considered all of the factors in General Statutes §§ 46b-62, 46b-81 and 46b-82 in the light of the evidence and its findings in fashioning the financial orders set forth below. The court has also considered the taxable implications and consequences of its awards.
Accordingly, judgment may enter as follows:
(1) A decree of dissolution of the marriage on the ground of CT Page 9946 irretrievable breakdown.
(2) The wife shall take, have and own the following property, free and clear of the husband's claims: 15 Coult Lane, Old Lyme, Connecticut, and all personal property therein (except as set forth below); 4 Mountain View, Wilmington, Vermont, and all personal property therein or in storage; her jewelry and furs; her cash on hand and in banks; and the IRA accounts and stocks totaling $73,760 shown on Schedule 4E of her July 13, 1994 financial affidavit. Also, securities valued at $30,000 as of the date of this decree shall be vested in and transferred to her from the husband's IRA accounts by appropriate instrument. The selection of securities shall be by the husband.
(3) The husband shall take, have and own the following property, free of the wife's claims: 27-29 Meadow View, Westerly, Rhode Island; 4 High Street, Old Lyme, Connecticut; his cash on hand and in banks, his life insurance cash values, his IRA accounts (excepting the $30,000 in securities transferred therefrom to the wife) and the miscellaneous securities shown on Schedules 4G and 4H of his June 22, 1994 financial affidavit, and all tangible personal property in his possession, and the following items now in the wife's possession:
(A) Original photos and videos that include husband's mother and other family members husband's friends including his military friends. Any items which include the wife shall be copied at husband's expense, and the wife shall have the copies.
(B) Copies of photos that include children (copies are to be made at husband's expense).
(C) Husband's high school yearbook and autographed cookbook by Lu Lockwood, his bicycle, video recorder, skis boots, clothing and ice skates, and his father's military sword.
(4) Each party shall pay all of the encumbrances, real estate taxes, etc., on the property set out to him or her and save the other harmless therefrom.
(5) The wife shall forthwith transfer her forty-one (41%) percent stock interest in RESCO to the husband and resign as director and officer thereof. The husband shall act to cause the corporation to transfer title to the Saab motor vehicle in the wife's possession to her subject to any encumbrances thereon. He CT Page 9947 shall also cause RESCO to take no steps to collect upon the "shareholders' loan" nor shall he cause the obligation to be assigned to anyone. The husband shall cause RESCO not to assert a claim for any unearned portion of the automobile insurance premium on said motor vehicle. He shall indemnify and save the wife harmless on account of any derivative corporate liabilities in her capacity as officer or director, accruing from and after May 1, 1993.
(6) The husband shall cooperate in allowing the wife to convert his present job-related health and medical insurance coverage for her benefit, under applicable law, at her expense. Counsel have provided no evidence to the court of the cost of same.
(7) The husband shall pay to the wife as periodic alimony, the sum of $225 per week which shall be reduced to $125 per week on June 1, 1996 when the wife is first eligible to receive social security benefits. Said alimony payments shall terminate upon the death of either party, or the remarriage of the wife, and may be modifiable pursuant to General Statutes § 46b-86(b). They shall be taxable to the wife and deductible by the husband.
(8) The husband shall irrevocably designate the wife as beneficiary of his National Service and CNA life insurance policies as shown on his financial affidavit so long as he shall be obligated to pay alimony hereunder. He shall assure that said policies shall provide a death benefit of not less than $50,000 in the aggregate and shall execute and deliver a written authorization to the wife directed to said carriers so she may, from time to time, determine the status and good standing of said policies.
(9) Each party shall pay his or her own attorney's fees.
(10) Each party shall be responsible for the liabilities shown on their respective financial affidavits.
(11) All instruments of title and other documents necessary or incidental to effectuate the orders herein shall be executed and exchanged with thirty (30) days hereof.
Teller, J.